Chester KASZUBA and Bernice Kaszu-
ba, Defendants-Appellants,

v.

Richard ZIENTARA, Plaintiff-Appellee.

No. 3–885A219.

Court of Appeals of Indiana,
Third District.

July 28, 1986.

Rehearing Denied Sept. 16, 1986.

Max Cohen, Cohen & Thiros, Merrillville,
for defendants-appellants.

Joseph M. Skozen and Richard S. Tebik,
Skozen & Tebik, Munster, for plaintiff-ap-
pellee.

HOFFMAN, Judge.

This case originates from a dispute over
entitlement to the proceeds of a winning
ticket in the Illinois lottery.

The parties are residents of Indiana.
Plaintiff/appellee Zientara requested that
his friend and co-worker, Chester Kaszuba,
purchase an Illinois lottery ticket for Zien-
tara. Bernice Kaszuba was employed in an
Illinois tavern where lottery tickets were
sold and Kaszuba had previously obtained
tickets for Zientara. Kaszuba agreed and
Zientara gave him an envelope containing
the purchase price and the number selec-
tions for the ticket. Zientara's was a win-
ning number combination and is worth
$1,696,800.00. However, Kaszuba refused
to give Zientara the ticket and made an
effort to collect the winnings. Zientara
filed suit claiming the proceeds on the bas-
es of fraud, bailment, breach of contract,
conversion and agency. Defendants/appel-
lants Kaszubas filed a motion to dismiss or
for summary judgment on the basis the
parties had entered into an illegal, and
therefore unenforceable, transaction. The
motion was denied, the cause went to trial
to a jury and a verdict was returned in
favor of Zientara. The Kaszubas allege
the trial court erred in denying their mo-
tion to dismiss or for summary judgment

since the agreement between the parties was in contravention of the public policy and laws of the State and is thereby rendered unenforceable in the courts of this State.

The established rule in Indiana denies citizens the use of the Indiana courts to enforce contracts which are illegal because violative of the statutory law or immoral because violative of the public policy of the State. *Sumner v. Union Trust Co. of Indianapolis* (1946), 116 Ind. App. 684, 66 N.E.2d 621. By refusing to aid either party, the court leaves the parties where it finds them and the status quo is maintained. *Van Orman v. Edwards* (1970), 148 Ind.App. 66, 263 N.E.2d 746. The fact that this refusal to assist either party may result in what appears to be an inequitable conclusion whereby one party receives a windfall, is a fact on which the judiciary cannot focus. *Van Orman v. Edwards, supra.* An illegal or immoral contract is void, *Sumner v. Union Trust Co., supra,* and "[a] void contract cannot be enforced, no matter what hardship it may work, or how strong the equities may appear." *Pipecreek School Tp. v. Hawkins* (1912), 49 Ind.App. 595, 599–600, 97 N.E. 936. The law on the effect of illegal and/or immoral contracts being so well established, the inquiry in this case must focus on whether or not such a contract was involved.

Contrary to the reasoning expressed in the dissenting opinion, the contract with which this litigation is concerned is that between Zientara and Kaszuba whereby Kaszuba took Zientara's money and number selections and agreed to furnish Zientara with an Illinois lottery ticket reflecting those numbers. This agreement was made in Indiana, by Indiana residents. The ticket was to be supplied to Zientara in Indiana. Indiana law therefore applies to this contract.

We are not concerned at this time with the contract created by the drawing of the winning numbers. That is the contract to which Judge Staton addresses his dissenting opinion. That contract is with the Illinois Lottery Commission, is not established until the drawing of the winning numbers and compels the Commission to pay to the owner of a ticket displaying those numbers a sum of money. That contract has not been placed in issue. The Commission has agreed to pay the owner of the ticket once the owner is determined. Such ownership being dependent on the contract between these two Indiana residents entered into in Indiana, the issue before this Court is the enforceability of that agreement pursuant to Indiana law.

Appellants rest their argument of error on the Indiana Constitution, Art. 15, § 8 which provides:

"§ 8. Lotteries; prohibition
Section 8. No lottery shall be authorized; nor shall the sale of lottery tickets be allowed."

This provision is said to evince the long-standing public policy against gambling in general and lotteries in particular, and is broad enough to cover a prohibition against all aspects of gambling.

Appellee in reply asserts that the constitutional provision is more narrow and prohibits only State authorization of a lottery or sale of tickets for same. He urges that this proviso in conjunction with the professional gambling statute [1] evinces a public

---

1. IND. CODE § 35–45–5–3:
"Professional gambling
Sec. 3. A person who knowingly or intentionally
(1) engages in pool-selling;
(2) engages in bookmaking;
(3) maintains, in a place accessible to the public, slot machines, one-ball machines or variants thereof, pinball machines that award anything other than an immediate and unrecorded right of replay, roulette wheels, dice tables, or money or merchandise pushcards, punchboards, jars, or spindles;
(4) conducts lotteries, gift enterprises, or policy or numbers games, or sells chances therein;
(5) conducts any banking or percentage games played with cards, dice, or counters, or accepts any fixed share of the stakes therein; or
(6) accepts, or offers to accept, for profit, money or other property risked in gambling;

policy and legislative intent prohibiting only professional gambling, not social pastimes which were involved herein. Therefore the transaction between the parties did not abridge public policy and/or statutory laws and was not unenforceable as illegal or immoral.

The exact scope of the constitutional provision need not be determined to decide the issue presented herein. A public policy against organized gambling is without doubt evidenced by the clause. This policy is examined and explained in detail in *State et al. v. Nixon* (1979), 270 Ind. 192, 384 N.E.2d 152 and need not be repeated. For purposes of this case, it is sufficient that the drafters of our Constitution found lotteries to be a means of preying on the poor and plundering the ignorant, *State v. Nixon, supra,* and this belief has led to a constitutional prohibition of lotteries and subsequent criminal statutes prohibiting gambling.

IND.CODE § 35–45–5–1 defines gambling:

> " 'Gambling' means risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device; but it does not include participating in:
>
> > (1) bona fide contests of skill, speed, strength, or endurance in which awards are made only to entrants or the owners of entries; or
> >
> > (2) bona fide business transactions that are valid under the law of contracts."

IND.CODE § 35–45–5–2 criminalizes gambling:

> "Unlawful gambling
>
> Sec. 2. A person who knowingly or intentionally engages in gambling commits unlawful gambling, a Class B misdemeanor."

These code sections together prohibit the act of putting money or property at risk to gain by lot or chance. Under this statutory scheme, the purchase of a lottery ticket is

commits professional gambling, a Class D felo-

an unlawful act based on the commonly accepted definition of the term lottery:

> "What is lottery? The courts of Indiana have placed no other interpretation on the word 'lottery' than its commonly accepted meaning, defined in Webster's New International Dictionary, as follows: 'A scheme for the distribution of prizes by lot or chance; esp., a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them, ... A game in which prizes are given from a pool to holders of cards matching others reserved for that purpose.' Lotteries are a species of gaming, and, although lotteries are gambling, not all forms of gaming or gambling are lotteries." *Tinder, Pros. Atty., et al. v. Music Op. Inc.* (1957), 237 Ind. 33, 40, 142 N.E.2d 610.

Therefore, the agreement involved in this case was to accomplish an act, *i.e.* purchase of a lottery ticket, which was illegal and against the public policy of this State.

The determination that the act of purchasing a lottery ticket is illegal and within the scope of public policy against gambling is supported by the scant Indiana case law on the subject. In *Rothrock v. Perkinson* (1877), 61 Ind. 39, the parties were southern Indiana residents. Rothrock and nine others purchased a ticket in a state authorized Kentucky lottery with each participant to receive a one-tenth interest. After the scheduled date of the drawing but before any collection of proceeds, Perkinson purchased from Rothrock a one-tenth interest in any proceeds to which Rothrock might become entitled. Rothrock refused to give Perkinson his share and Perkinson sued for same. The trial court found in favor of Perkinson and the Indiana Supreme Court affirmed. The Court stated:

> "It is well settled in this State that every scheme for the division or disposition of property or money by chance, or any game of hazard, is prohibited by law, and that every contract or agreement in aid of such a scheme is void as against pub-

ny."

lic policy. *Swain v. Bussell*, 10 Ind. 438; *Riggs v. Adams*, 12 Ind. 199; *Higgins v. Miner*, 13 Ind. 346; *Thatcher v. Morris*, 11 N.Y. 437." *Rothrock v. Perkinson, supra*, 61 Ind. at 45.

The Court pointed out that the elements of chance had been eliminated and the funds had become a prize by the time Perkinson entered into the agreement. Further:

> "The possession, control or ownership of the ticket seems not to have entered into the negotiation at all, nor does it appear, even inferentially, that the appellee had any connection with the purchase or sale of the tickets in the first instance, or with any of the chances which entered into the drawing upon it...." *Rothrock v. Perkinson, supra*, 61 Ind. at 46.

The Court distinguished the original, illegal participation in the lottery from the Perkinson contract which was said to be a new contract with new consideration even though it concerned the illegally gained proceeds, and the Court affirmed Perkinson's right to enforce the agreement. In contrast, the present case is the case distinguished by the *Rothrock* Court: the original contract to do an illegal act is at issue and the possession, control and ownership of the ticket is the subject of the suit.

In *Swain v. Bussell and Others* (1858), 10 Ind. 438, the Court refused to aid the recipient of shares in a real estate scheme in obtaining the benefit of the shares. Swain argued that the receipt of the shares for property conveyed to Bussell was not an illegal or immoral transaction. The Court seemed to find all participation indefensible and stated:

> "It was evidently the intention of the framers of our fundamental law, and our statute, to discountenance and, as far as possible, suppress gambling in all its forms, one of the most seductive phases of which is presented in the guise of lottery schemes and chance distributions of property. If the plaintiff, with the facts before him, saw proper to become a participant in such an illegal and prohibited transaction—a transaction not only in violation of the statute and the constitutional prohibition, but evidently, from the view taken of it by our law-makers, in contravention of public policy as understood by them, he is not in condition to ask, in this form, the aid of a Court of justice to relieve him from the superior skill of his associate. Such combinations were viewed by our legislators as formed to deceive and defraud the public. And if one of the associates should, by his greater disregard of right, succeed in defrauding his fellows, Courts are not open to administer relief to them in the manner here sought, because of their participation in those acts so much at war with public policy." *Swain v. Bussell, supra*, 10 Ind. at 442–443.

The Court also cited a New York case, *Thatcher v. Morris*, 11 N.Y. 437, as representative of its view:

> "In *Thatcher v. Morris*, 11 N.Y. 437, the Court of Appeals of New York held, that in a suit upon lottery tickets to recover the prize drawn by such tickets in a Maryland lottery, the plaintiff must show on the face of his complaint that his title was acquired—his contract made—in a jurisdiction where gambling was authorized by law; because such tickets were a part of the machinery for carrying on a business prohibited by law. In the same case, it is stated to be conceded that such a contract is immoral, and that no right of action can accrue to a party by reason of such contracts and dealings." *Swain v. Bussell, supra*, 10 Ind. at 442.

These cases, as well as the previously discussed constitutional and statutory provisions, lead to the unavoidable conclusion that the State of Indiana considers an agreement to participate in a lottery, even to the limited extent of purchase of a ticket, an illegal and immoral act. The agreement in question was made in Indiana, between two Indiana residents; the envelope with the money and number selections was delivered in Indiana; and the ticket was to be delivered back to Zientara in Indiana. Thus Indiana law governs the contract. *See, Eby v. York-Division Borg-Warner* (1983), Ind.App., 455 N.E.2d 623. Pursuant

to the rules on nonenforcement of illegal contracts discussed above, this agreement cannot be enforced through the Indiana courts.

Zientara argues the doctrine of comity to allow enforcement of the agreement since the subject matter is legal in Illinois. However, even the rule of comity, if applicable, would not change the result of this case. Comity does not require enforcement of contracts violative of the public policy of the State as declared through legislative enactments. *Vandalia R. Co. v. Kelly* (1918), 187 Ind. 323, 326, 119 N.E. 257.

The agreement being unenforceable in the Indiana courts, the trial court erred in denying the Kaszubas' motion to dismiss. The trial court judgment is reversed and the cause is remanded, and the trial court is instructed to grant the motion to dismiss.

Reversed.

GARRARD, J., concurs.

STATON, P.J., dissents with opinion.

STATON, Presiding Judge, dissenting.

I dissent from the Majority Opinion for the following reasons:

1.  The Majority has failed to frame the issue in the proper light of the facts. A question of first impression has been presented, and none of the cases cited by the Majority involve a transaction performed in another state where the transaction is authorized by statute.

2.  The question involves Zientara's foreign-based right to gain possession of a lottery ticket and title to $1,696,-800.00. The Majority ignores the present and prevailing moral sense test which is commonly used.

3.  I do not believe that the Indiana Constitutional prohibition against licensed lotteries is so broad as to deny a citizen's foreign-based contractual right to collect money when the purchase of the ticket is in a state where the purchase is legal and when the payment of the money is by a legally licensed lottery commission in a sister state.

4.  The Majority's position, refusal to judicially enforce a vested foreign-based contractual right, does not serve as a deterrent to Indiana citizens who desire to participate in legally licensed lotteries in Illinois, Michigan, or Ohio. It does encourage conversion of another citizen's property which is very much against Indiana public policy.

5.  I disagree with the Majority's conclusion that Indiana law governs the contract.

The question presented for our review is one of first impression in Indiana:

Whether the Indiana Courts will judicially enforce a legally vested foreign-based contractual right to the possession of a lottery ticket which has won $1,696,-800.00 in a lottery authorized by a statute in the state of Illinois.

Bernice Kaszuba who was employed as a waitress in an Illinois tavern purchased two lottery tickets for Zientara at the tavern where they were offered for sale. The numbers selected by Zientara won $1,696,-800.00. However, Kaszuba refused to deliver the lottery tickets to Zientara so that he could collect his money from the Illinois Lottery Commission. Zientara brought an action to recover possession of the lottery tickets. After a trial by jury, a verdict was rendered for Zientara. Kaszuba appeals.

None of the cases cited by the Majority involve a transaction performed in another state. *Sumner v. Union Trust Co. of Indianapolis* (1946), 116 Ind.App. 684, 66 N.E.2d 621, (*in banc*), *trans. den.* (contract to sell sealed "Moon" and "Lightning" coupons to customers in Marion County, Indiana); *Van Orman v. Edwards* (1970), 148 Ind.App. 66, 263 N.E.2d 746. (Fort Wayne restaurant lease in violation of statute governing place of consumption of beer—lease unenforceable); *Rothrock v. Perkinson* (1877), 61 Ind. 39, *reh. den.* (Plaintiff in Columbus, Indiana purchased one-tenth of Kentucky lottery winnings. The money had been paid to a Columbus

bank by the Kentucky lottery. The plaintiff sued the defendant lottery winner and the bank. The Indiana Supreme Court held that the plaintiff could recover.)

Substantially all of the commentators agree that foreign-based rights should be judicially enforced unless enforcement would be judicial approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense. (Beach, Uniform Interstate Enforcement of Vested Rights, 27 Yale L.J. 656, 662; Goodrich, Conflict of Laws [3d ed., 1949], 305; 2 Rabel, Conflict of Laws; A Comparative Study [1947], 555–575; Paulsen and Sovern, "Public Policy" in the Conflict of Laws, 56 Col.L.Rev. 969; 3 Beale, Conflict of Laws [1935], 1649.) The Majority did not apply the prevailing moral sense test. If it had, it would have affirmed the trial court.

Judicial enforcement of vested foreign-based contractual rights is not a static concept. It requires a careful examination of the prevalent moral sense at the time of the action to enforce the contract. As Judge Cardozo reflected in *Loucks v. Standard Oil Co.*, (1918) 224 N.Y. 99, 111, 120 N.E. 198, 202: "The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors, unless help would violate some * * * prevalent conception of good morals".

The Majority's reliance on *State et al. v. Nixon* (1979), 270 Ind. 192, 384 N.E.2d 152 as a test to judicially enforce a vested foreign-based contractual right is misplaced. *Nixon* held that the Pari-Mutuel Wagering Act constituted a lottery and was prohibited by Article 15, § 8 of the Indiana Constitution. It held that a lottery could not be authorized by the legislature. The real question that needed to be answered by *Nixon* was whether a pari-mutuel was a lottery, and *Nixon* answered the question in the affirmative. No one ever doubted that Article 15, § 8 of the Indiana Constitution prohibited lotteries. But *Nixon* does not apply the test that must be applied in the present case. All of the dicta in *Nixon* regarding the wisdom of the constitutional prohibition of lotteries has no application to the question before this Court.

The test to be applied is the prevailing moral sense test: is the mere possession by an Indiana resident of a lottery ticket purchased in Illinois where the sale of lottery tickets and the holding of lotteries are approved by statute so inherently vicious, wicked or immoral, and shocking to the prevailing moral sense that the Indiana resident's right to possession of the ticket will not be judicially enforced in Indiana?

Zientara gave Bernice Kaszuba money to purchase his Illinois lottery tickets. The tickets represent a legally enforceable contract between Zientara and the Illinois Lottery Commission. The Illinois lottery is authorized by statute. Its purpose is "... to implement and establish within the State a lottery to be operated by the State, the entire net proceeds of which are to be used for the support of the State's Common School Fund, except as provided in Section 21.2." Ill.Ann.Stat. ch. 120, § 1152 (Smith Hurd, Supp.1986). The exception refers to the Illinois Land Grant Collegiate Athletics Fund. Two other states, Ohio and Michigan, on Indiana's border have similar lotteries. It has been estimated that Indiana residents spent $88 million dollars on lotteries in Illinois, Michigan, and Ohio during 1984. (*Indianapolis News*, December 21, 1984; "Inside Scoop" by Jack Averitt.) The Majority's refusal to judicially enforce Zientara's vested contractual right to the lottery ticket will not act as a deterrent to those Indiana citizens who choose to participate in Illinois, Michigan, and Ohio lotteries.

The sale and purchase of the lottery tickets were legal in Illinois, since they were authorized by the Illinois statutes. If the prevailing concept of good moral sense test is applied to the transaction in Illinois, it does not appear that there is anything inherently vicious, wicked or immoral, or shocking about the Illinois lottery or its purpose—support of a Common School

Fund and Athletics Fund. The mere possession of a lottery ticket is not prohibited by statute in Indiana. *Brooks v. State* (1967), 249 Ind. 291, 231 N.E.2d 816. The Indiana Constitution, Article 15, § 8, has not been violated, since the sale of the tickets took place in Illinois and the lottery was conducted in Illinois. The prohibition of authorized lotteries by the Indiana Legislature and the sale of lottery tickets is left inviolate.

Other states have been faced with the same question before this Court, and they have judicially enforced the vested contractual right. In *Castilleja v. Camero* (1967), 414 S.W.2d 424, a Texas resident brought an action to recover one-half ($17,000.00) of the winnings in a Mexico lottery. A partnership had been formed to purchase lottery tickets in Mexico and share the winnings. One of the partners went to Mexico and on his return refused to share the winnings. The Supreme Court of Texas held that the defense of illegal transaction could not stand and awarded the plaintiff one-half of the winnings from the lottery in Mexico. The issue was expressed as follows: "... whether Texas policies or Texas interests are sufficiently involved to deny recognition of the right by Texas courts." It applied the prevalent moral sense test and concluded: "... it cannot be said that recognition of the event which is indirectly involved here, and which gave rise to Severa's title, is against 'good morals or natural justice.' This is especially so when such a position would require protecting a person who has converted the property of another. Conversion is an act which is indeed contrary to natural justice. * * * Texas has a strong public policy against conversion of property. * * * This policy against conversion is the paramount interest involved here."

In *Miller v. Radikopf* (1975), 394 Mich. 83, 228 N.W.2d 386, the Michigan Supreme Court held that a vested contractual claim to share money legally paid by the Irish Sweepstakes and legally possessed by the defendant may be enforced. The Court stated: "It is a crime to 'set up or promote' a lottery in this state. It is similarly a crime for a person to 'sell,' 'offer for sale,' or 'have in his possession with intent to sell or offer for sale' lottery tickets. However, it does not appear that Irish law prohibits the payment of money to holders of winning sweepstakes tickets. Nor does any statute or rule of law of this state prohibit the holder of a winning ticket from receiving and retaining proceeds paid voluntarily by a lottery without legal action." As to judicial enforcement, the Michigan Supreme Court observed: "Judicial nonenforcement of agreements deemed against public policy is considered a deterrent for those who might otherwise become involved in such transactions. While nonenforcement of Miller's claim might tend to discourage people from agreeing to split their legal winnings, nonenforcement would not tend to discourage people from buying or selling Irish Sweepstakes tickets."

The Majority's refusal to enforce Zientara's vested contractual right and title to possession of the lottery ticket held by Kaszuba will not deter Indiana citizens from buying lottery tickets in Illinois; it would create an atmosphere of mistrust and reward those who would convert another's property to their own use and profit. If the mere possession of a lottery ticket purchased in another state by an Indiana citizen is to be made unlawful as a matter of public policy, the Indiana Legislature—not the Judges of this Court—should enact a statute declaring mere possession of a lottery ticket unlawful. Our basic function as a Court is not to choose deterrents to further our concept of proper public policy but to decide a conflict of laws question: can a foreign-based contractual right be enforced judicially in Indiana.

When a similar conflict of laws question was placed before the New Jersey Supreme Court, it held that a gambling debt contracted in San Juan, Puerto Rico could be judicially enforced against a resident of New Jersey although gambling was against New Jersey public policy. *Caribe Hilton Hotel v. Toland* (1973), 63 N.J. 301, 307 A.2d 85. While considering the conflict

of law question, the Court stated: "Puerto Rican law controls the question as to the legality of the contract. Whether we simply say that the legality of a contract is to be determined by the law of the place where the contract is made (citations omitted) or whether we adopt the more modern formulation that rights and duties of contracting parties shall be determined by the law of the jurisdiction having the most significant relationship to the parties and to the transaction, Restatement, Conflict of Laws 2d § 188; (other citations omitted) * * * the result in this case will be the same." 307 A.2d at 86.

The New York Court of Appeals noted: "Over 100 years ago this court held in *Thatcher v. Morris*, 11 N.Y. 437 [1854] that a contract involving lottery tickets if legal and valid without the State would be upheld though illegal in New York." *Intercontinental Hotel Corporation v. Golden* (1964), 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 at 212. (Desmond, C.J., and Van Voorhis, J., dissenting.) In *Golden*, the defendant had given a check and an I.O.U. to cover a gambling debt at a casino in Puerto Rico. Later, he stopped payment on the check and offered the defense of an illegal transaction as not being judicially enforceable. As to the proposed defense, the Court stated: "Worthy though such considerations be, they apply only to transactions governed by our domestic law. This court gave thought to such arguments recently and rejected them as an insufficient basis for projecting domestic philosophies of law to decision making in actions based on transactions governed by the law of another State (citations omitted)" 203 N.E.2d at 212.

The Majority incorrectly assumes that because Chester Kaszuba and Richard Zientara are co-workers and Indiana residents that Indiana law rather than Illinois applies to the transaction's legality. *Eby v. York-Division Borg-Warner* (1983), Ind. App., 455 N.E.2d 623, written by Judge Miller, is relied upon by the Majority as authority for its position. Its reliance is misplaced. In *Eby*, Indiana was the jurisdiction having the most significant relation-

ship to the parties. Eby had been employed by Borg-Warner in Indianapolis before he left for Florida to assume the job offered by the Borg-Warner Division in Florida. As Judge Miller points out in his opinion: "Larry was in Indiana when he accepted the job offer over the telephone. The negotiations were begun in Indiana and progressed over the telephone in Indiana by personal appearance in Florida. Indiana was the location where the Ebys performed the alleged consideration, * * * Lastly, the Ebys resided in Indiana where Larry accepted the job while he was working at one of Borg-Warner's facilities."

In the present case, Zientara gave the money for the lottery tickets to Chester Kaszuba so that he could give it to his wife who was a waitress in an Illinois tavern where lottery tickets were sold. She purchased the lottery tickets in Illinois. The place of the contract between Zientara and the Illinois Lottery Commission was in the State of Illinois. The lottery was held in Illinois. The winning ticket must be presented to the Illinois Lottery Commission in Illinois for payment. It is indisputable that the most significant relationship of the parties, Zientara and the Illinois Lottery Commission, is in Illinois and not in Indiana. The *Restatement (Second) of the Conflict of Laws*, § 188 (1971) provides:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

\*　　\*　　\*　　\*　　\*　　\*

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

The *Restatement (Second) of Conflict of Laws* was cited and followed by Judge Miller in *Eby* and should be followed by the

Majority under the facts of the present case.

I would affirm the trial court. It was correct when it judicially enforced the contract and recognized Zientara's title and right to possession of the lottery ticket.